**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CLIFFORD DELROY DAWKINS, JR., <br><br> Plaintiff, <br><br> v. <br><br> RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY, RUTGERS LAW SCHOOL, JOHANNA BOND, SHANI KING, CHARLES AUFFANT, individually and collectively, JOHN/JANE DOES 1-5, fictitious individuals to be named after discovery, <br><br> Defendants. | Civil Action No.: <br><br> *(Filed Electronically)* <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMAND** |

Plaintiff, Clifford Delroy Dawkins, Jr. ("Plaintiff" or "Dean Dawkins"), by and through his attorneys, Law Offices of Roosevelt Jean, as and for his Complaint in this action against Rutgers, the State University of New Jersey, Rutgers Law School, Johanna Bond, Shani King, Charles Auffant, John/Jane Does 1-5, fictitious individuals to be named after discovery (collectively, "Defendants"), hereby alleges as follows:

**NATURE OF THE CLAIM**

1.      This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices against Plaintiff, including its discriminatory treatment and harassment of Plaintiff due to his race and age, and Defendant's unlawful retaliation against him, including wrongful termination of his position as Assistant Dean & Director of the Minority Student Program at Rutgers Law School, after he complained about unlawful discrimination and/or illegal financial activities in the workplace.

2.      This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

1

§2000(e), et seq., as amended by the Civil Rights Act of 1991, at 42 U.S.C. §1981(a) ("Title VII"), the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. ("NJLAD"),  New Jersey Conscientious Employee Protection Act ("CEPA"), codified as N.J. Stat. § 34:19-1,  and other common law causes of action.

## SUBJECT MATTER JURISDICTION AND VENUE

3.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as this action arises under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1342(a)(4) because this action seeks to redress the deprivation, under color of state law, of Plaintiff's constitutional rights. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

4.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

5.     This action is also brought pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201, such that federal question jurisdiction exists pursuant to 28 U.S.C. § 1331.

6.     Supplemental jurisdiction also exists over state law claims pursuant to 28 U.S.C. § 1367.

7.     Venue is appropriate pursuant to 28 U.S.C. § 1391(b) since Defendants reside in the District, and the events and omissions complained of occurred in the District.

## ADMINISTRATIVE PROCEDURES

8.     Prior to the filing of the present Complaint, on or about January 21, 2026, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission

2

("EEOC"), alleging violations of Title VII.

9. Plaintiff's EEOC charge arises out of many of the same facts alleged herein that pertain to his Title VII discrimination claims.

10. On or about March 6, 2026, the EEOC completed its investigation of Plaintiff's charge and issued Plaintiff a Notice of Right to Sue.

11. Any and all prerequisites to the filing of this suit have been met.

**PARTIES AND PERSONAL JURISDICTION**

12. Clifford Delroy Dawkins, Jr. ("Plaintiff" or "Dean Dawkins"), a resident Rockaway, New Jersey 07866, is a 38-year-old Black male, of Jamaican descent, and 2015 graduate of Rutgers Law School's Newark campus; he also earned a Master of Public Policy from Rutgers University's Edward J. Bloustein School of Public Policy; and he received his Bachelor of Science in Business Administration from Cornell University.

13. Prior to joining Rutgers Law School (hereinafter, "RLS" or the "Law School") in the spring of 2021, he had amassed over a decade of experience in higher education administration and specialty programs at Cornell University, University of Pennsylvania, Rutgers University, and Princeton University.

14. Dean Dawkins joined the RLS as the Assistant Dean & Director of the MSP in the spring of 2021, following a competitive national search.

15. Shortly after joining RLS, Dean Dawkins was also offered and accepted an adjunct teaching role, teaching, for example, the Law School's most popular Alternative Dispute Resolution ("ADR") course, which Dean Dawkins taught ostensibly year-round (spring, summer, and fall semesters) and pre-law summer courses.

16. Dean Dawkins also published books and peer-reviewed articles while serving as

Dean of the MSP, as recommended by his superiors.

17.    For half-a-decade, up until he was abruptly and unjustly terminated by RLS Dean Johanna Bond, Plaintiff served with objective excellence as the Assistant Dean & Director of the MSP on the Law School's Newark Campus.

18.    Based on Dean Dawkins' exceptional leadership of the MSP, in or about early July of 2025, then Interim Chancellor & Provost of Rutgers University's Newark campus, Dr. Jeffrey A. Robinson, submitted an application packet nominating Dean Dawkins and the MSP leadership team for a university-wide recognition called the "Presidential Award", specifically an award called the "2025 Rutgers Gateway Award for Service to Students." *See*, A true and accurate copy of the packet of nomination materials submitted by Dr. Robinson on behalf of Dean Dawkins (hereinafter, the "Presidential Award Packet"), attached as **Exhibit A**.

19.    Under Dean Dawkins' leadership, in 2022 the MSP received its first American Bar Association ("ABA") recognition in its over half-century history, having been awarded the ABA's Dean Henry J. Ramsey Award.

20.    Under Dean Dawkins' leadership, the MSP grew from entering cohorts of approximately thirty (30) first-year law students to consistent cohorts of over one hundred (100+) first-year law students, an unprecedented increase of the population to nearly 45% of the overall law school student population on the Newark campus alone.

21.    Under Dean Dawkins' leadership, MSP Scholars academically outperformed their non-MSP peers on average.

22.    Under Dean Dawkins' leadership MSP "graduation rates are at an all-time high, attrition is at a record low, and MSP Scholars lead across every major law journal, student organization, and moot court board."

23.     Under Dean Dawkins' leadership, student, alumni, and employer partner satisfaction with MSP programming, training, and workshops, as measured via survey data, maintained steady 90%+ approval ratings.

24.     Under Dean Dawkins' leadership, the MSP fundraised millions of dollars in event sponsorships, internship, and externships.

25.     Under Dean Dawkins' leadership, the MSP operated at an annual profit and never returned a deficit in terms of its fiscal operations.

26.     In the Fall of 2023, under Dean Dawkins' leadership, RLS's financial professionals announced in a faculty meeting that the only two departments at the law school that yielded annual operational profits are the Foundation Department and the MSP.

27.     Under Dean Dawkins' leadership, MSP became more than a mere legal diversity program; instead growing into a program that "plays a role in virtually every major function of the Law School and enjoys robust partnerships with institutions and practitioners across the legal field, including the judiciary, private practice, corporations, legal nonprofits, social justice organizations, and more."

28.     In addition to Interim Chancellor Robinson, Dean Dawkins exceptional work in the MSP was well recognized, including by stakeholders and employer partners such as the President of the Student Bar Association ("SBA"), the president of the Women's Law Forum, the Editor-in-Chief of the Rutgers Race & the Law Journal, the President of the Rutgers Law Newark Alumni Association, the Director of the undergraduate Intercultural Resource Center, as well as employer partners like the professionals at the Federal Equal Employment Opportunity Commission ("EEOC").  *See*, **Exhibit A**.

29.     In addition to his on-campus contributions and achievements, Dean Dawkins also

5

earned community and peer-reviewed recognitions, including but not limited to the NAACP of Morris County's Heritage Award, the Urban League of Morris County's Change-Maker Award, Rutgers Law School's Gallery of Heroes Award, NJBIZ Education Power 50, NJBIZ Leaders in Law Award, Thomson Reuters "Super Lawyers Rising Star"; Best Lawyers in America: Ones to Watch, and was named among the National Bar Association's Nation's Best Advocates: Top 40 Under 40 (Centennial Class).

30. According to its websites, Defendant Rutgers, The State University of New Jersey (hereinafter "Rutgers" or "RU") "stands among America's highest-ranked, most diverse public research universities. The oldest, largest, and top-ranked public university in the New York/New Jersey metropolitan area, you'll find us at our main locations in three New Jersey cities, and our footprint can be seen around the region. We're an academic, health, and research powerhouse and a university of opportunity."

31. Also according to its website, Defendant Rutgers values include the following: "The Rutgers community embraces and upholds the fundamental values that define the university: academic excellence that's both accessible and affordable; building a community where every single member of the university has a voice; and serving the common good while making a meaningful difference in the world."

32. Defendant RLS is a dual campus institution located in both Newark, NJ and Camden, NJ.

33. According to its website, Defendant RLS is guided by an express "commitment to equity and anti-racism" and is further "dedicated to fostering an inclusive community" insofar as RLS purportedly "believe[s] in embracing differences and advocating for inclusion in all aspects of legal education and beyond."

6

34. Also according to the Law School's website, Defendant RLS states, "We know it's not enough to say that discrimination is bad - which is why we practice what we preach."

35. At all times here relevant, Defendant Johanna Bond is the first "Unitary Dean" of the Law School, and was hired in July of 2023 to preside over both of RLS' Newark and Camden campus, with purported expertise in "international human rights law and gender and the law."

36. At all times here relevant, Defendant Shani King served as Vice Dean of Rutgers Law on the Newark Campus and was Dean Dawkins' immediate supervisor.

37. At all times here relevant, Defendant Charles Auffant served as a Clinical Law Professor and as the law school Dean's appointed Chairman of the MSP Oversight Committee, and exercised oversight authority over Dean Dawkins and the MSP Department.

38. At all times here relevant, RLS Dean Johanna Bond was the immediate supervisor to Vice Dean King.

39. At all times here relevant, RLS Dean Johanna Bond was Professor Charles Auffant direct report regarding the MSP Oversight Committee's dealings.

40. At all times relevant hereto, Defendants were acting through their agents, servants, and employees (i.e., Dean of the Foundation, Robert Steinbaum; Dean of Student Life, Sarah Regina; Director of the Academic Support Program, Eileen Pizzuro; Dean of the Center for Career Services, Stephanie Gomez; and Dean of Admissions, Matthew Saleh), who were acting within the scope of their authority, in course of their employment, and under the direct control and direction of Defendants.

41. At all times material herein, Defendants are and have been a "person" and "employer" as defined under the ADA, Title VII, and NJLAD, and are accordingly subject to the

7

provisions of each said statute.

## FACTS

42.    Plaintiff has served as the MSP Dean since April of 2021 and is a proud 2015 graduate of both RLS and the MSP.

43.    For most of his tenure as Dean of the MSP, Dean Dawkins was the sole Black male administrator at RLS, which he discussed with professionals at RLS in advance of accepting the offer to serve.

### *Background Re: Plaintiff's Negotiated Terms of Employment*

44.    In April of 2021, following a rigorous national search, application, and multi-round pitch process, Dean Dawkins was approached by then Interim Dean of the MSP, Charles Auffant and, RLS Co-Dean, David Lopez, and offered the role of MSP Dean.

45.    At the time, in addition to negotiating for an additional support hire in the MSP, Dean Dawkins negotiated for the title of "Associate Dean & Director of the MSP" and a higher salary but was informed by then Dean Lopez both were possible outcomes in time, but that there existed a pay equity concern with Dean Dawkins' Camden MSP Dean counterpart and Dean Lopez wanted to keep the MSP Deans respective pay in parity.

46.    Importantly, at the time of Dean Dawkins' negotiations, Dean Lopez was concurrently working for a private law firm while also serving as the Co-Dean of RLS.

47.    With the understanding, Dean Dawkins specifically negotiated a similar employment relationship whereby Dean Dawkins would also be able to continue his private practice, albeit in a limited capacity, while serving as the MSP Dean.

48.    With great sympathy for a program Dean Dawkins personally felt he owed respect to and a debt of gratitude for his own law school and career progress, Plaintiff accepted what was

8

couched as a "temporary deal to serve as the Dean of the MSP" with the understanding that Dean Dawkins and Dean Lopez would reassess and renegotiate in six (6) months' time.

49.     Following the parties negotiating at arms-length, Dean Lopez agreed to Dean Dawkins' contingency that he would be able to continue his private practice and Dean Dawkins ultimately accepted the offer to serve as MSP Dean.

50.     Unfortunately, approximately two (2) weeks into his start, without notice and during a tremendously tumultuous time for the law school where RLS was in the national news for a controversy between its Black law students and the faculty/administration, as reported on by the New York Times, Inside Higher Ed, Black Enterprise, and the ABA's Journal for a controversy involving a Professors allowing the use of the "N-word" in one of her class sessions, Dean Lopez abruptly resigned his post.

51.     Dean Dawkins inherited the MSP at its sincere nadir—poor graduation rates, deeply disgruntled students, general academic underperformance for students of color, frustrated professors, subpar bar passage rates, among other sincere institutional concerns.

52.     RLS's culture and environment at the time called for swift action, cultural competence, and incisive leadership, all of which Dean Dawkins helped to supply.

#### *Background Re: Abrupt Change of Plaintiff's Immediate Supervisor*

53.     Shortly after the news broke of Dean Lopez stepping down, RLS announced that Rose Cuison-Villazor, then Vice Dean of the Law School under Dean Lopez, would be to fill the position in Dean Lopez's stead as the "Interim Co-Dean" for RLS's Newark campus.

54.     Dean Cuison-Villazor, the first Asian American woman law school dean in the country, then became Dean Dawkins' direct supervisor, and met with him regularly providing positive feedback and guidance.

55.    Dean Cuison-Villazor worked closely with Dean Dawkins on actionable goals and objectives for his role and conducted mid-year and annual written reviews of Dean Dawkins' performance in his role as MSP Dean.

56.    Dean Cuison-Villazor provided glowing, positive mid-year and annual performance evaluations during her time working with Dean Dawkins.

### *Background Re: Dean Cuison-Villazor's Seeking Raise & Promotion for Dean Dawkins*

57.    In or about May of 2022, a year prior to Dean Cuison-Villazor exiting her Interim Co-Dean post, she attempted to fulfill a promise begun by Dean Lopez and filed the necessary paperwork to seek a raise and title change for Dean Dawkins.

58.    Indeed, Dean Cuison-Villazor requested Dean Dawkins submit a memorandum laying out the reasons justifying his raise and promotion, which memo was submitted with Dean Cuison-Villazor's filing for the same. *See*, A true and accurate copy of June 7, 2022 Memo to Dean Cuison-Villazor re: Dean Dawkins raise and promotion (hereinafter, the "Dean CV Memo"), attached as **Exhibit B**.

59.    Dean Dawkins also worked with the then HR Director, Qadim Ghani, on submitting the request for a raise and promotion over the next several months, who ultimately explained that the application for raise and promotion was not granted by Rutgers University Human Resources.

60.    Also, while working under Dean Cuison-Villazor, Dean Dawkins was allowed the opportunity to teach courses at the law school as an adjunct professor nearly year-round; however, in a sudden change, Dean Cuison-Villazor claimed that a new policy (which was never provided in writing) had been put in place that disallowed or limited administrators being able to teach courses at the law school.

61.    Dean Dawkins vehemently objected to and opposed the abrupt change and requested the related policy from Dean Cuison-Villazor to no avail.

62.    Even so, Dean Dawkins' complaints aside, he was later asked to again serve as an adjunct teaching during the following spring of 2024, but with the caveat that he now could only teach over the summer months.

63.    Dean Dawkins accepted the opportunity to continue serving as an adjunct professor conditionally, with the promise by staff of revisiting teaching during the semesters at a later date.

64.    Following a faculty vote of "no confidence" in the spring of 2023, Dean Cuison-Villazor (and her Camden counterpart) exited her post in or about June of 2023, prior to Dean Bond's official start in July of 2023 as the first "Unitary Dean" of RLS's dual campuses.

### *Background Concerning Plaintiff's Support of Dean Bond's Onboarding to RLS*

65.    When the October 7, 2023 attacks between Israel and Palestine transpired internationally, the impacts were acutely felt on the RLS Newark campus.

66.    Controversies on campus swelled to a fever pitch, again thrusting RLS into mainstream news when a Jewish law student filed a lawsuit against RLS for antisemitism.

67.    In that environment, Dean Cuison-Villazor and her Co-Dean counterpart received a faculty vote of "no confidence" and it was announced that the experimental co-dean structure of the merged RLS would be changed to a "unitary" dean structure, and that the next RLS dean would preside over both Newark and Camden campuses.

68.    Following the faculty vote of "no confidence", Rutgers University established a "search committee", composed of faculty and administrators from both of RLS's Newark and Camden campuses.

11

69.     The "search committee" was tasked with conducting a national search for the next and first "unitary" dean for RLS.

70.     Dean Dawkins was appointed to and served on the "search committee" that worked with a third-party executive recruiting firm that produced the candidates for the RLS Dean position.

71.     Following his service on the "search committee", Dean Dawkins further volunteered and served as the liaison who introduced Dean Bond to the staff during her campus visit as a finalist for the position.

72.     At the conclusion of the "search committee's" work, Defendant Johanna Bond would ultimately receive an offer from Rutgers University to serve as the Dean of RLS—an outcome that was the product of a technical compromise, both campuses having ranked a higher top candidate.

73.     After Dean Bond had accepted the position, but prior to her official start, Dean Dawkins arranged for lunch with Dean Bond and Assistant Director of the MSP, Dr. Lenore Pearson, to welcome Dean Bond to the RLS community officially and discuss how the MSP could be of assistance with the success of her administration.

74.     When the 2023-2024 academic year first began, the rapport between Dean Bond and Dean Dawkins was positive, Dean Bond extending an offer to Dean Dawkins for a short-term "CoAd Agreement", which contracts would be extended for two (2) years while Dean Bond agreed to continue to pursue a promotion to the Associate Dean level and raise on behalf of Dean Dawkins.

75.     Dean Dawkins received only one year of the promised "CoAd Agreement" at $10,000.00, which was offered as an inducement to retain his talents at RLS.

12

76.     In addition to the "CoAd Agreement" and promotion/raise promises, on or about September 18, 2024, Dean Bond and Defendant Vice Dean Shani King offered Dean Dawkins a prestigious opportunity to take on a visiting tenure-track faculty position.

77.     Dean Dawkins ultimately declined this position, as Vice Dean King informed him he would have to relinquish his position as MSP Dean to take advantage of the offer for the visiting tenure-track faculty role.  *See,* A true and accurate copy of September 2024 Email Exchange Between Vice Dean King and Dean Dawkins Re: Visiting Faculty Offer (hereinafter, the "Faculty Offer"), attached as **Exhibit C.**

78.     On September 19, 2024, in an email to Vice Dean King declining the Faculty Offer, Dean Dawkins explained, "[T]he requirement that I give up the post of MSP Dean to pursue this opportunity is personally unsettling.  While I am personally/professionally committed to advancing legal scholarship, and will continue to publish and (with permission) to continuing to teach, I am also concerned with the longevity of the MSP and remain steadfast in my dedication to ensuring the success of this program that I love and that has done/is doing so much good for so many." *Id.*

79.     In the same September 19, 2024 exchanged with Vice Dean King, Dean Dawkins further explained his most immediate concerns for the MSP in light of the Faculty Offer, stating, "The suggestion, for example, that Dean Auffant would carry this significantly expanded program alongside his many other responsibilities at the law school, particularly in view of how the program was transitioned to me upon my start, is one point of the proposed arrangement that I find deeply unsettling.  Stated differently, I recall how much of a toll administering the MSP and his stellar Clinical program took on him, as we worked closely together during that timeframe; I also recall how stretched the program was at that time and how many of our

students felt they did not have the support they needed." *Id.*

80.    Moreover, in the same exchange, Dean Dawkins discussed both his concerns about the legalistic implications and moral implication the weighty decision he was making to decline the "once-in-a-lifetime" Faculty Offer before him, stating, "The existing proposal would require a rushed transition that would no doubt prove harmful to the MSP, so I cannot, in good conscience, pursue personal gain at the expense of the community I belong to (as a graduate of the MSP) and am committed to serve with excellence and pride. . . . While I do have professional ambitions and personal dreams, I am also a mission-driven individual, and our important mission-focused work  for the MSP is not yet where it could/needs to be." *Id.*

81.    The strong start notwithstanding, a short time into Dean Bond's tenure as the first Unitary Dean of Rutgers Law School, Dean Bond became aggressively motivated to push Dean Dawkins out of the University.

### *Background Re: Dawkins's Whistleblower Complaints of Financial Misappropriation (Protected Activity)*

82.    In or about October of 2023, Dean Dawkins requested from the Dean of the Foundation (RLS's fundraising arm), Robert Steinbaum, information about fundraising that might support initiatives and programming in the MSP (specifically, a judicial partnership program).

83.    Dean Steinbaum responded with offense to the request for information by Dean Dawkins and copied Dean Bond on his email describing the fundraising efforts he had accomplished prior to Dean Dawkins time as MSP Dean.

84.    Following this exchange, Dean Dawkins and Dr. Pearson requested and were granted a meeting with RLS's CFO and Head of Business Services, Jeffrey Balog, who explained

14

that Dean Bond had taken the MSP's annual gala proceeds to assist with reconciling the law school's overall budget deficit.

85.    Dean Dawkins was genuinely upset by the information Mr. Balog shared with him and Dr. Pearson, explaining that the funds had been wrongfully misappropriated, and began immediately to brainstorm options for shielding MSP's gala proceeds from Dean Bond taking them in the future.

86.    At the time the Dean Dawkins objected to the diversion of funds from the Rutgers University Minority Student Program, he reasonably believed that such conduct constituted violations of law, rule, regulation, or clear mandates of public policy governing the stewardship and use of charitable and donor-restricted funds solicited for designated institutional programs, including but not limited to: **(i)** the Uniform Prudent Management of Institutional Funds Act ("UPMIFA"), N.J.S.A. 15:18-25 et seq., governing the management, expenditure, and preservation of institutional and donor-restricted funds; **(ii)** the Uniform Management of Institutional Funds Act ("UMIFA"), the predecessor statute reflecting the same public policy requiring charitable institutions to honor donor restrictions on institutional funds; **(iii)** the charitable-trust principles recognized under New Jersey law requiring that funds donated for a specific charitable purpose be used in accordance with donor intent; **(iv)** the fiduciary duties imposed upon officers and administrators responsible for the stewardship and protection of charitable assets, including the prohibition against the misappropriation or diversion of charitable funds from their intended purpose; **(v)** generally accepted accounting principles governing the classification, reporting, and use of donor-restricted funds by nonprofit institutions; and **(vi)** other applicable laws, regulations, and clear mandates of public policy governing the proper stewardship, accounting, and protection of charitable and donor-restricted funds entrusted to

nonprofit and public institutions.

87.    Dean Dawkins, Dr. Pearson, and Mr. Balog came up with the idea of creating an account specifically for the housing of the MSP's annual gala proceeds going forward, so they would not be subject to taking for budget reconciliation purposes henceforth.

88.    Following their conversation, Mr. Balog created the MSP's colloquially named, the "*Building Fund*" and placed there future profits from MSP's annual galas in 2024 and 2025.

89.    Dean Dawkins responded to Dean Steinbaum and Dean Bond, objecting to Dean Bond having taken approximately $20,000.00 from the MSP's 2023 annual gala fundraiser proceeds to purportedly reconcile RLS's overall budget deficit, especially as those funds were specifically earmarked for MSP's departmental programming and summer internships for law students.

90.    Indeed, each ticket sold for the MSP's annual gala specifies that, in exchange for a tax-exempt donation, the proceeds from the MSP Gala will go to MSP's programming and Summer Internship Program ("SIP").

91.    For the balance of the Fall 2023 semester, Dean Dawkins then followed up consistently with Mr. Balog, Vice Dean King, and professionals within the Rutgers University—Newark's Chancellor's Office objecting to and questioning when the MSP's 2023 gala proceeds would be returned.

92.    Unfortunately, MSP's 2023 gala proceeds were never returned to the department.

93.    After Dean Dawkins began to object to and ask questions about the MSP 2023 gala proceeds, (protected activity under NJ CEPA laws), he rapidly fell out of favor with Dean Bond and, in fact, became the subject of her dogged scornfulness.

94.    Dean Bond, upon information and belief, cautioned Mr. Balog to be discreet when

16

discussing the Budget with Dean Dawkins, as Dean Dawkins was allegedly "riling up" law students about the budget.

### *Background Re: Source of Dean Bond's Retaliatory Animus Toward Dean Dawkins*

95. On or about Wednesday, February 14, 2024 (Valentine's Day), following up on their email exchange back in October of 2023, Dean Dawkins was called into a closed-door meeting with Deans Bond, Steinbaum, and King.

96. In this closed-door meeting, Dean Dawkins was forcefully berated like a child, interrogated, and talked down to by Deans Bond and Steinbaum.

97. On February 19, 2024, Dean Bond sent an email correspondence accusing Dean Dawkins of "shouting" at her and Dean Steinbaum in their closed-door meeting, to which Dean Dawkins responded with a clear, full recitation of what had truly transpired in the meeting. *See,* A true and accurate copy of the February 19, 2024 Email Exchange Between Dean Bond and Dean Dawkins Re: "Shouting" (hereinafter, the "Shouting Accusation"), attached as **Exhibit D.**

98. On March 21, 2024, Dean Dawkins met with Dean King for a scheduled one-on-one follow-up meeting, in which he, in relevant part, again followed up the request for the return of the $20,000.00 taken by the team, additional hired support for the MSP, and specifically opened a conversation about how he was feeling "deflated" due to several "incidents of targeted efforts towards the MSP".

99. In this March 21, 2024 conversation with Vice Dean King, Dean Dawkins ironically described being "yelled at" by the Associate Dean of Student Life, Sarah Regina, in an open faculty meeting, which was so objectively embarrassing that some of his colleagues had reached out to share their condolences for the treatment.

100. In this March 21, 2024 conversation with Vice Dean King, Dean Dawkins

specifically complained about, and they discussed, race and age discrimination.

101. In this March 21, 2024 conversation with Vice Dean King, Dean Dawkins complained about feeling he was being subjected to a hostile environment.

102. In this March 21, 2024 conversation with Vice Dean King, Dean Dawkins complained about Dean Bond targeting and hyper-scrutinizing him and the MSP.

103. In this March 21, 2024 conversation with Vice Dean King, Dean Dawkins and Vice Dean King specifically discussed concerted efforts to target Dean Dawkins by Dean Bond and other administrative colleagues and colleagues providing misinformation to Bond.

104. In this March 21, 2024 conversation with Vice Dean King, Vice Dean King broached Dean Regina, Director Pizzuro, and Dean Dawkins brought up issues and incidents involving Dean Steinbaum.

105. Dean Dawkins and Vice Dean King, his immediate supervisor, often discussed how to navigate targeting, discrimination, and hostile work environment based on Dean Dawkins being a Black man (for a time, the only Black male administrator on RLS's Newark Campus) and based on Dean Dawkins' (younger) age.

106. In this March 21, 2024 conversation with Vice Dean King, Vice Dean King shared, as he often would, his own anecdotal stories of being a dark-skinned Latino man and how he navigated experiences with racism professionally in his own career to help assist Dean Dawkins think through how best to do the same.

107. In this March 21, 2024 meeting with Vice Dean King, Dean Dawkins complained of race discrimination, age discrimination, Bond targeting of him, and that other administrators like Dean Regina, Director Pizzuro, and Dean Steinbaum were coordinating efforts to target and undermine Dean Dawkins personally and the MSP generally.

108. In this March 21, 2024 meeting with Vice Dean King, Dean Dawkins also reiterated his desire to meet with and work more closely with Dean Bond.

109. In this March 21, 2024 meeting with Vice Dean King, Dean Dawkins offered to meet regularly and work directly with Dean Bond in their limited interactions, as well in writings to Vice Dean King; however, after Dean Dawkins' October 2023 complaints about the taking of MSP's 2023 gala proceeds, Dean Bond cut off all communication with Dean Dawkins, refused to meet with him, and would cancel any meetings put on her calendar by secretarial staff.

110. Indeed, in this March 21, 2024 meeting with Vice Dean King, validating Dean Dawkins' concerns, Vice Dean King shockingly shared his view that, "***you don't necessarily have to be a jerk to be a racist***", and said he was committed to helping Dean Dawkins navigate these issues and would share Dean Dawkins' stated concerns with Dean Bond. (Emphasis added)

### *Dean Bond Retaliates for Dean Dawkins' Complaints to Dean King (Protected Activities)*

111. On April 15, 2024, following Dean Dawkins' numerous prior protected activities, which included, among other things, raising concerns about Age, Race, and the misappropriation of Gala Funds, Vice Dean King scheduled a meeting with Dean Bond and Dean Dawkins on after the MSP Gala.

112. In this April 15, 2024 meeting, after lauding Dean Dawkins on an exceptional MSP Gala and program year, Dean Bond launched into a list of inaccurate and unsubstantiated performance concerns and shifted the meeting into what Dean Bond described as a "performance evaluation".

113. In this April 15, 2024 meeting, Dean Bond confronted Dean Dawkins about complaining to Vice Dean King about discrimination and targeting and characterized his

19

complaints as "insubordination."

114.    In this April 15, 2024 meeting, Dean Dawkins contested Dean Bond's characterization of his actions in going to his immediate supervisor with such complaints of discrimination and targeting as a "misstatement of the law."

115.    In this April 15, 2024 meeting, Dean Dawkins also discussed with Dean Bond and Vice Dean King his belief that their desire to place a numeric "cap" on the MSP's admissions could expose Rutgers University to potential liability for unwittingly creating an illegal quota system.

116.    One day later, on April 16, 2024, Dean Dawkins met again with Vice Dean King for a one-on-one meeting and discussed, in relevant part, Dean Bond's baseless critiques of Dean Dawkins in their April 15th meeting, Dean Dawkins complaints that he had no access to Dean Bond and his concerns she is being fed misinformation about Dean Dawkins by other administrators, Dean Dawkins shock that the meeting was improperly couched as a "performance evaluation" and that his conversations and complaints to Vice Dean King were deemed "insubordinate" by Dean Bond, as well as Dean Dawkins' inability to win the false "whisper campaign" being spread by other administrators about his work hours.

117.    In their April 16, 2024 follow-up meeting, Vice Dean King responded that he would help Dean Dawkins by requesting a meeting to present the MSP with Dean Bond, advises Dean Dawkins attempt to reframe the conversation with Dean Bond, Vice Dean King offers to speak with Dean Dawkins' other administrative colleagues, and agreed to follow up with Dean Bond about why she said the meeting was a performance evaluation as that was not his understanding of the purpose of the meeting.

118.    On July 10, 2024, Dean Dawkins attended a scheduled one-on-one meeting with

20

Vice Dean King at which they specifically discussed Vice Dean's articulation of Dean Bond's concerns about Dean Dawkins' outside work activities based on Dean Dawkins' private practice public listing him as "Managing Partner".

119.    At this July 10, 2024 meeting with Vice Dean King, Vice Dean King said to Dean Dawkins that "I'm not telling you, you can't practice law. Do what you need to do for your family. Just make sure your work for the law school is done", he said, "I'm not going to tell you not to practice law", he also said, "I'm not telling you not to do it, just be smart about it."

120.    At this July 10, 2024 meeting with Vice Dean King, Vice Dean King said to Dean Dawkins, "From my perspective, Cliff . . . you're doing your job. You're doing it well. You know like who the fuck cares?" and lauded Dean Dawkins on the success of the MSP insofar as the "statistics speak for themselves".

121.    At this July 10, 2024 meeting with Vice Dean King, Dean Dawkins also specifically complained that Dean Bond refused to meet with him, that the environment was still very hostile, and that he was being targeted by Dean Bond.

122.    At this July 10, 2024 meeting with Vice Dean King, Vice Dean King made no direct or indirect comments suggesting Dean Dawkins had violated any Rutgers University policies.

123.    At this July 10, 2024 meeting with Vice Dean King, Vice Dean King speculates that Dean Bond's concern, as informed by others planting information with her, is that no one at RLS should be allowed to work two full-time jobs, with the most negative interpretation being a question of whether Dean Dawkins was working for his law firm "on university time."

124.    At this July 10, 2024 meeting with Vice Dean King, Dean Dawkins explained that he had negotiated with Dean Lopez to continue his practice and that Dean Cuison-Villazor had

already investigated him and cleared him of any wrongdoing concerning his properly reported outside work activities.

125.    At this July 10, 2024 meeting with Vice Dean King, Dean Dawkins explained that he believed the issue of his outside work activities was being planted with Dean Bond by other administrators that were engaged in a concerted effort to target Dean Dawkins and the MSP.

126.    After the July 10, 2024 meeting with Vice Dean King, Dean Dawkins followed up with Vice Dean King via email sharing the  email where past Dean Cuison-Villazor cleared him of any wrongdoing concerning his outside work activities.  *See,* A true and accurate copy of the December 20, 2021 Email from Interim Co-Dean Cuison-Villazor Clearing Dean Dawkins Re: Outside Work Activities Investigation (hereinafter, the "Clearance Email"), attached as **Exhibit E.**

127.    Dean Cuison-Villazor's Clearance Email set forth the standards by which Dean Dawkins was to conduct himself regarding his outside work activities and specifically provides, "I wanted to close the loop on our previous discussion regarding your affiliation as the managing partner at your law firm. ***I've spoken with university officials***, and we determined that ***there are no ethical or university concerns with respect to you serving as managing attorney of your law firm.*** As long as you continue to submit the outside employment information when the university asks for it, that you do not let your work with the firm interfere with your work as Assistant Dean of MSP (which I know has not been an issue), and you do not use any Rutgers resources toward your work with the firm, then your outside activity with the firm is consistent with university policies." *Id.* (Emphasis added).

128.    On December 21, 2021, Dean Dawkins responded to Dean Cuison-Villazor, stating his understanding of the requirements placed on him following months of being

investigation of his outside work activities, stating, "I will be sure to submit the outside activities forms *when prompted to do so*, and I will continue to *keep my involvements outside of leading MSP completely separate, per your instructions and University policy*." *Id.* (Emphasis added).

129.    No one at Rutgers University ever changed, modified, or otherwise clarified any part of Dean Cuison-Villazor's the Rutgers University's post-investigation instructions, nor Dean Dawkins' express understanding of Dean Cuison-Villazor's instructions to Dean Dawkins regarding the process for submitting and seeking approval for his outside work activities.

130.    In that same correspondence July 10, 2024 email correspondence to Vice Dean King forwarding the Clearance Email, Dean Dawkins continued to complain to Vice Dean King about targeting and differential treatment, stating, "With the absolute and utmost respect for you professionally and personally, I do hope that I can level with you to some degree and speak candidly without courting penalty. Atop of the pay/promotion question, being undeniably understaffed, and woefully stretched thin individually (this, following years of being promised a hire in the MSP Department), these incidents of hyper scrutinization are further deflating, disorientating, and distracting. I do sincerely hope we can get to a place of mutual understanding, cooperation, and support. I am, of course, open to guidance on how to accomplish this earnest-held aim." *See,* A true and accurate copy of the July 10, 2024 Email from Dean Dawkins to Vice Dean King Sharing Results of Dean Cuison-Villazor Outside Work Activities Investigation, attached as **Exhibit F.**

131.    Following this meeting, Vice Dean King advised Dean Dawkins that he was fine to continue his outside work activities, clearing Dean Dawkins for a *second* time.

132.    At all times here relevant, Vice Dean King - like Dean Dawkins - has been listed as "Managing Partner" of the New York office of his own private practice, King & Ruiz

Case 2:26-cv-02392-MCA-CF    Document 1    Filed 03/07/26    Page 24 of 58 PageID: 24

Litigation Boutique.

133. Also in or about July of 2024, Professor Auffant shared with Dean Dawkins and Dr. Pearson, when Dean Dawkins confided in him that he was under investigation, that he found it odd Dean Dawkins was continuously being investigated for his outside work activities when Professor Auffant had first-hand experience with receiving emails from Vice Dean King's private law firm on Rutgers business.

134. Dean Dawkins and Professor Auffant had many conversations about the MSP being targeted and undermined by Dean Bond.

135. Prior to October of 2025, Professor Auffant offered to be an advocate to Dean Bond on Dean Dawkins behalf and on behalf of the MSP, as he worked closely with Dean Bond as her appointed Chair of the MSP Committee

136. MSP, a department serving the needs of all students, but diverse students in particular, is the only department at RLS with an appointed oversight committee, which Dean Dawkins has also complained about to RLS faculty.

137. Upon information, in contrast to Dean Dawkins, Vice Dean King was not subjected to investigation for his outside work activities.

138. Upon information, no other administrator aside from Dean Dawkins was subjected to multiple investigations for their outside work activities aside from Dean Dawkins.

139. Upon information, Vice Dean King and Dean Bond failed to report Dean Dawkins' many complaints of targeting, discrimination, or hostile environment.

140. Upon information, Vice Dean King and Dean Bond failed to investigate Dean Dawkins' many complaints of targeting, discrimination, or hostile environment.

141. Upon information, Vice Dean King and Dean Bond instead aided and abetted

24

others in their attempts to target, discriminate against, and subject Dean Dawkins to a hostile environment.

### *Dean Bond Escalates Retaliatory Actions Against Dean Dawkins Via Surrogates*

142.    In the months between July of 2025 and the Spring of 2026, Dean Dawkins and Dr. Pearson made significant updates and upgrades to the MSP to ensure compliance with regulations following the decision by the Supreme Court in *Students for Fair Admissions v. Harvard/UNC* and subsequent Execute Order coming from the federal government.

143.    This was a tense timeframe that spurred important conversations and debates about the future of the MSP, for which Dean Dawkins had an expansive and inclusive vision for the future of the MSP, which deeply offended Professor Auffant as the Chair of the MSP Committee.

144.    In or about October of 2025, Dean Dawkins invited Professor Auffant to a presentation about Dean Dawkins' vision for the future of the MSP, to which Professor Auffant responded negatively and expressed his disdain with Dean Dawkins, stating "you're making the same mistake your predecessor Bravo-Webber made . . . You think the MSP is yours . . . Well, we're going to organize and get you out."

145.    Specifically, Professor Auffant and Dean Dawkins disagreed about admissions process for participation in the MSP and the racial makeup of the MSP, with Professor Auffant criticizing Dean Dawkins decision to allow White and/or affluent applicants into the MSP and shared his belief that Dean Dawkins was "watering down" the MSP.

146.    Professor Auffant was also upset that Dean Dawkins was entertaining a conversation about a name change for the MSP, given questions from applicants, contemporary students, and employer partners who were hesitating about continued participation in MSP's

programs in light of the federal government targeting law practices that engaged in diversity, equity, and inclusion initiatives.

147. Professor Auffant, a 1984 graduate of the MSP, often made demeaning age-based comments to Dean Dawkins, talking down to him and saying "you're young, you'll get over it," and "you're full of piss and vinegar," and "you are too young to understand you need to kiss the ring," and "when you get to my age, you'll understand."

148. In their October 2025 conversation, Dean Dawkins protested Professor Auffant's demeaning, condescending, and ageist comments, and the conversation became so tense that Dr. Pearson called for the meeting to end.

149. Dean Dawkins would learn soon after that exchange that Professor Auffant approached Vice Dean King and Dean Bond and began to engage in back-door talks and hatched a plan to get rid of Dean Dawkins.

150. On or about March 31, 2025, in response to faculty members' questions, in response to faculty members requesting information about the MSP post-admissions application process, Dean Dawkins drafted a memo to the MSP Committee with the subject "Background Re: MSP's Post-Admissions Process".

### *Dean Bond Takes Substantial Step in Concerted Effort to Terminate Dean Dawkins*

151. Upon information, Dean Bond and Paul Rollins engaged in regular discussions with other administrators, including but not limited to Professor Auffant, Mr. Balog, Dean Regina, Director Pizzuro, and Interim Dean of Career Services Stephanie Gomez, about their efforts to gather information and find a technical reason - from 3 years prior - to have Dean Dawkins terminated.

152. In or about May of 2025, Dean Dawkins was contacted by Damian M. Salvati,

Rutgers University Compliance Investigator from the Office of University Ethics & Compliance regarding an "anonymous tip" that effectively triggered a *third* investigation of Dean Dawkins' outside work activities.

153.    Dean Dawkins cooperated with Mr. Salvati's investigation, sharing with him the Clearance Email, and inquiring why Rutgers University's Human Resources Department was not included in the investigation because Dean Dawkins believed Mr. Salvati's office was being improperly "weaponized" against Dean Dawkins.

154.    On or about June 23, 2025, Mr. Salvati completed this third investigation of Dean Dawkins' outside work activities and issued his conclusion in an "original report".

155.    On or about August 6, 2025, Vice Dean King exchanged emails with Dean Dawkins and explained that Dean Bond had decided not to approve Dean Dawkins' teaching appointment with the undergraduate Honors Living Learning Community ("HLLC") without proper justification.

156.    Dean Dawkins understood the denial of his HLLC teaching appointment was another act of retaliation by Dean Bond as a part of her plan with others to push him out of RLS.

157.    In accordance with Mr. Salvati's advisement on how to receive a copy of his final report, Dean Dawkins requested a copy of Ms. Salvati's original investigative final report from Vice Dean King on several occasions, in writing and verbally, but Vice Dean King refused to provide a copy of the requested report.

158.    On August 28, 2025, Mr. Salvati contacted Dean Dawkins about a fourth investigation of his outside work activities, this time specifically requested by Dean Bond according to Mr. Salvati.

159.    On August 28, 2025, Mr. Salvati also explained to Dean Dawkins that the Rutgers

University Office of Information Technology had conducted a search of Dean Dawkins multiple Rutgers University email addresses, based on the Office of General Counsel pulling information from Dean Dawkins' private practice dockets for his private practice, and his LexisNexis account.

160.    Dean Dawkins protested these invasive tactics by Rutgers University, doubling down on the fact that he felt the various departments and significant Rutgers University resources were being "weaponized" to target him on behalf of Dean Bond.

161.    On November 21, 2025, in a memorandum to Dean Bond marked "Strictly Confidential", authored Vice President & Chief University Compliance Officer, Rachael A. Honig, Ms. Honig shared the final report from Mr. Salvati, explaining of results of the fourth and most invasive investigation, that there was "no new substantiated findings."

162.    Notwithstanding Dean Dawkins' many requests, verbally and in writing, Vice Dean King and Dean Bond refused to provide Dean Dawkins with the results of Mr. Salvati's third and fourth investigations.

163.    On December 4, 2025, Dean Dawkins sent to Vice Dean King a follow-up email request for Mr. Salvati's final investigative reports and further explained, "on one occasion, Dean Bond even broached our conversations and admonished me for coming to you with such complaints, referring to my actions in bringing my concerns to your attention as 'insubordinate'. At the risk of being further so labeled, I am here renewing my request for copies of the reports resulting from the multiple investigations against me(at this time, my count is four (4) investigations, which have included probing, intrusive, and precarious searches of my private practice filings, my work email, and even my password protected LexisNexis account). Of course, the University's investigator confirmed that I am the only administrator at Rutgers Law

28

School who has been subjected to such an intense, extensive investigation, notwithstanding the fact that a number of administrators also have reported outside work activities." *See,* A true and accurate copy of the December 4, 2025 Email from Dean Dawkins to Vice Dean King Re: Request for UEC Investigative Reports, attached as **Exhibit G.**

164.    In the same December 4, 2025 email correspondence from Dean Dawkins to Vice Dean King, Dean Dawkins again complains of discrimination, retaliation, and targeting where he states:

> "[A]s I have expressed to you on a number of occasions in the past*, I feel I am being hyper-scrutinized, targeted, discriminated against, and now retaliated against*. I am, as always, open to further discussing these and other issues I have broached and continue to bring up when we have our one-on-one meetings." *Id.* (Emphasis added).

165.    On December 8, 2025, Vice Dean King responded acknowledging receipt of Dean Dawkins' correspondence and offered that he was reaching out to Dean Bond with Dean Dawkins' request for Ms. Salvati's final investigative report.

### *Dean Bond Abruptly, Wrongfully Terminates Dean Dawkins*

166.    On or about January 6, 2026, Dean Bond sent correspondence to Dean Dawkins, notifying him of an organizational restructuring that placed him directly under Dean Bond in the law school's organizational chart.

167.    On or about January 14, 2025, Dean Dawkins attended Dean Bond's scheduled Senior Leadership Team Meeting, at which meeting Dean Bond and MSP Dean on the Camden Campus made a public announcement that Dean Dawkins and his spouse had just given birth to a baby boy in October of 2025.

168.    Following his wrongful termination, Dean Dawkins has been medically diagnosed with anxiety and depression and is seeking professional care regarding his symptoms, which has

29

had a negative impact on Dean Dawkins spouse and family life.

169.    At the time of his surprise termination, Dean Dawkins was in talks with Rutgers University Human Resources about the process for his extended intermittent paternity leave when Dean Bond moved to terminate him.

170.    On January 20, 2026 (the day after Martin Luther King Day), at approximately 10:14 AM, Dean Bond sent a text message to Dean Dawkins, coldly stating, "Please confirm your attendance today at noon. Thank you."

171.    At approximately 11:00 AM, following scheduled meetings, Dean Dawkins checked his email to find a Notice of Pre-Termination and a draft Termination Letter from Dean Bond and RLS Human Resources Representative, Alicia Wilshire-King.

172.    Shocked and confused by the correspondence, Dean Dawkins responded to Dean Bond's correspondence, requesting that someone from Rutgers University Human Resources be requested to attend the meeting.

173.    Dean Bond denied this request, stating that Rutgers University Human Resources had declined to participate in the meeting when she inquired.

174.    Dean Dawkins attended the scheduled noon Pre-Termination Hearing and provided responses to the contents of the draft letter, explaining that its contents are demonstrably false.

175.    Within an hour of Dean Bond's Pre-Termination Hearing, Dean Dawkins was locked out of all Rutgers University systems.

### Dean Bond and Professor Auffant Defame Dean Dawkins (False Light)

176.    Shortly after being terminated by Dean Bond, Dean Dawkins began receiving screenshots of an email sent out by Dean Bond and Professor Auffant to the entire faculty, staff,

30

and student body announcing his termination, effective immediately.

177. Subsequently, Dean Bond and Professor Auffant sent out mass announcements to all MSP alumni and all MSP employer partners, including but not limited to the judiciary, private practitioners, corporate counsel, nonprofit legal organizations, and social justice legal organizations, announcing Dean Dawkins' immediate termination.

178. In their communications to faculty, staff, students, MSP alumni, and external employer partners, Defendants Bond and Auffant, acting in concert and with the approval of the Office of General Counsel, made and/or caused to be made the false and defamatory statement of fact that Dean Dawkins had engaged in inappropriate interactions with and/or mistreatment of students at Rutgers Law School — conduct so egregious as to warrant his immediate termination.

179. Also, in their communications to faculty, staff, students, MSP alumni, and external employer partners, Defendants Bond and Auffant, acting in concert and with the approval of the Office of General Counsel, made and/or caused to be made the false and defamatory statement of fact that Dean Dawkins had engaged in some unspecified form of financial malfeasance — conduct so egregious as to warrant his immediate termination.

180. These statements were knowingly false.

181. At no time did Dean Dawkins engage in inappropriate interactions with or mistreatment of any student.

182. To the contrary, student organizations and alumni groups publicly and unanimously demanded his reinstatement, directly refuting Defendants' false characterization.

183. Defendants knew this statement was false when made or acted with reckless disregard for its truth or falsity.

31

184.    At no time did Dean Dawkins engage in any form of financial malfeasance.

185.    To the contrary, Rutgers University's UEC final investigative report submitted by Mr. Salvati, following four (4) invasive investigations of Dean Dawkins — the final of which was specifically requested by Dean Bond and yielded no new findings, contained no findings of financial misconduct by Dean Dawkins.

186.    Defendants knew this statement was false when made or acted with reckless disregard for its truth or falsity.

187.    Dean Bond and Professor Auffant also held several public town hall meetings with students and alumni, and faculty meetings where they jointly announced that Dean Bond and Professor Auffant had met prior to Dean Bond making the decision to terminate Dean Dawkins and made a deal, Professor Auffant explaining that he said to Dean Bond he would not take the position of Interim MSP Dean unless Dean Bond agreed not to diminish the MSP in any way.

188.    These various public announcements by Dean Bond and Professor Auffant operated to place Dean Dawkins in a false light in his community of peers.

189.    Indeed, in one faculty meeting in February of 2026, a faculty member confirmed with Dean Bond that her email had been approved by the Office of General Counsel, which Dean Bond confirmed publicly, and faculty member went on to explain that the wording of the email made it seem like Dean Dawkins had committed an act so egregious it warranted immediate removal.

190.    In fact, Dean Bond's Termination Letter suggested that Dean Dawkins had violated Rutgers University's outside activities policy back in 2023 and, failing to abide by Rutgers University's own progressive discipline policy.[1]

---

[1] https://uhr.rutgers.edu/employee-discipline-information-supervisors

191. Indeed, Rutgers University's Progressive Discipline policy states, in relevant part, "Discipline should not generally come as a surprise to the employee. Occasionally employees are unaware of their supervisors' dissatisfaction until they suddenly receive a formal written reprimand or a letter of suspension. Try to avoid this situation, if possible, and attempt to regularly communicate issues to employees rather than wait until the problems can no longer be tolerated or until annual performance reviews are conducted."

192. The policy further provides, "In most cases, the purpose of discipline is to instruct and correct rather than to punish. It is your responsibility as a manager/supervisor to explain to the employee those areas in which they are expected to improve, to make suggestions about how to improve, and to allow time for the employee to make improvements."

193. Dean Bond afforded Dean Dawkins no progressive discipline whatsoever and sought a technical reason to justify terminating him.

194. Demonstrating Dean Dawkins reliance on the unchanged guidance of Interim Co-Dean Cuison-Villazor's December 20, 2021 post-investigation instructions, the Mr. Salvati's Final Investigative Report states, "King advised that some of their staff and Dawkins had not been submitting their OAQs and King had sent out an email telling employees that this needed to be done. King recalled sending this email to Dawkins and within 15 minutes, Dawkins completed his OAQ[.]"

195. Shortly after Dean Bond terminated Dean Dawkins, he received a physically mailed copy of the formal Termination Letter; however, seemingly everyone in the legal community was informed before Dean Dawkins received formal notice.

196. Upon information and belief, shortly after Dean Bond acted to wrongfully terminate Dean Dawkins, she also ratified the termination of Mr. Balog.

33

197. After terminating Mr. Balog, unlike Dean Bond and Professor Auffant's treatment of Dean Dawkins, RLS sent out no mass correspondences announcing Mr. Balog's immediate termination.

198. Neither Dean Bond nor anyone else at RLS sent out a broadcast email to all alumni of the law school.

199. Neither Dean Bond nor anyone else at RLS sent out a broadcast email to all external vendors of the Business Services Department announcing the change.

200. While both Dean Dawkins and Mr. Balog were allegedly terminated for cause, within a week of one another, Dean Dawkins is an under-40-year-old Black male, and Mr. Balog is a middle-age White male.

201. Dean Dawkins contends the difference in the treatment of his termination and that of Mr. Balog's is found in the fact Dean Bond was motivated by discriminatory animus and purposefully treated the two terminations differently based on his race and age.

### *Dean Dawkins' Appeals Termination; Rutgers University Commits Due Process Violations*

202. On or about January 21, 2026, Dean Dawkins filed a complaint against RLS and Rutgers University with the Federal Equal Employment Opportunity Commission ("EEOC").

203. Additionally, Dean Dawkins, with the advice of legal counsel, properly filed an appeal via Rutgers University's internal appeal process, called the "Problem Solving Procedure for Managerial, Professional, Supervisory and Confidential (MPSC) Personnel" (hereinafter, the "Problem Solving Procedure") under Rutgers University Policy 60.4.4.

204. Rutgers University describes Policy 60.4.4. as follows: "Regularly appointed Managerial, Professional, Supervisory, and Confidential (MPSC) staff members have reasonable employment protection and *have recourse to the 'due process' procedure outlined in this policy*

34

for the resolution of an alleged violation of university policy or administrative regulation with respect to conditions of employment, or for grieving disciplinary actions." (Emphasis added).

205.    Rutgers University Policy 60.4.4 provides a four-step process for seeking to informally resolve an alleged violation of university policy and provides the purpose of the policy is "[t]o provide a procedure for use by any managerial, professional, supervisory, or confidential staff member for the resolution of an alleged violation of university policy or administrative regulation."

206.    In the process of submitting information to proceed with the due process provisions outlined in Rutgers University Policy 60.4.4[2], Rutgers University Human Resources Assistant Vice President of the Office of Workplace Culture, Ms. Carolyn M. Dellatore, confirmed in a written correspondence that Dean Dawkins' official termination date in the University system was logged as January 5, 2026.

207.    The Problem Solving Procedure provides, in part, "In processing a grievance under this procedure, employees may solely have the assistance of a university administrative staff member of their choosing to help present their case. However, in the interest of solving problems in an informal manner, such an administrative staff member may not be an attorney nor may a faculty member who is an attorney serve in this representative role in Steps 1, 2, or 3 outlined below."

208.    Accordingly, On February 10, 2026, Dean Dawkins sent correspondence to Ms. Dellatore requesting clarification, explaining he was being prejudiced in what was supposed to be Rutgers University's due process safeguards, and further explaining, "[T]his policy appears to be a general policy applying to all departments of Rutgers University. Please correct me if I am

---

[2] https://policies.rutgers.edu/B.aspx?BookId=12129&PageId=459497

wrong.  If so, the frequency of a faculty or staff member being a lawyer, as seemingly proscribed under the policy shared by Dean Bond, is arguably much lower in other departments compared to the law school context, where *most* faculty/staff members have JDs (myself included).  I suspect this policy is not meant to be administered unevenly across the University (but, again, please correct me if I am wrong). Therefore, ***I need clarity on who qualifies as a 'Representative' in the law school context***, so I can find someone available for tomorrow afternoon's meeting with the precious little time I have remaining."  (Emphasis in original).

209.    Despite Dean Dawkins' express desire to have a representative with him for Step 1 of the Problem Solving Procedure, Ms. Dellatore denied Dean Dawkins the same, stating, "University policy permits an employee to have a representative present at a Step 1 hearing, provided that the representative is not an attorney. For purposes of this policy, an attorney is any individual who is legally authorized to practice law. As previously stated, the selection and arrangement of a representative is the responsibility of the individual exercising that option. The University does not identify, screen, or recommend representatives."

210.    Dean Dawkins followed up with Ms. Dellatore to confirm whether she had made a typo, but Ms. Dellatore declined to respond to Dean Dawkins' request for clarification.

211.    On February 11, 2026, Dean Dawkins appeared for and participated in the Step 1 hearing process, which was presided over by Dean Bond.

212.    On or about February 18, 2026, Dean Bond issued her written Step 1 Final Decision, ultimately determining to affirm her own termination decision, stating, "I have carefully considered your interpretation of events and your arguments. After this careful consideration, I continue to believe that the termination was justified. I am, therefore, affirming my decision to terminate your employment at Rutgers Law School." *See,* A true and accurate

copy of Dean Bond's February 18, 2026 Step 1 Final Decision (hereinafter, "Step 1 Decision"), attached as **Exhibit H.**

213. In her Step 1 Decision, nearly a month after termination, Dean Bond states for the very first time, "I wanted to let you know that your potential CEPA and discrimination claims have been referred to the appropriate University offices." *Id.*

214. In sum, the Dean Bond's stated rationale for sandbagging Dean Dawkins with an abrupt and rushed process of termination was cherry-picked "policy defalcations" that stemmed from three (3) years prior in 2023 concerning Dean Dawkins' outside work activities as a practicing attorney (known to the University upon Dean Dawkins' commencement of employment with Rutgers) and a series of unattributed negative comments that Dean Dawkins submits also stemmed from at least two (2) years prior during the April 15, 2024 meeting with Dean Bond and Vice Dean King.

215. Dean Dawkins further notes that any performance-related allegations in his termination letter were all derived from discussions that occurred in the singular meeting held by Dean Bond and Vide Dean King on April 15, 2024.

216. Dean Dawkins found it telling (and even broached with Dean Bond in his Pre-Termination Hearing) that Dean Bond had the Termination Letter in draft for a *very* long time because there were no issues articulated therein that transpired within the last two (2) years.

217. On February 19, 2026, Dean Dawkins properly submitted materials to move forward with Step 2 of Rutgers University's Problem Solving Procedure, including Dean Bond's Step 1 Final Decision, as well as other proofs directly responsive to the allegations contained in Dean Bond's Termination Letter.

218. Rutgers University's Problem Solving Procedure provides, in relevant part, "The

37

request for a Step 2 hearing is to be submitted to the next level of authority beyond the Step 1 hearing officer.  For purposes of this policy, the next level of authority shall be referred to as the Step 2 hearing officer."

219.    Accordingly, Dean Dawkins submitted the proper Step 2 application and support materials to Dean Bond's superiors, explaining, "Given that I was reorganized to report directly to Dean Johanna Bond on or about January 6, 2026, and confirmed, during the 'pre-termination' hearing on January 20, 2026, that she was my immediate supervisor, I am submitting this request for a **Step 2** hearing with the professionals to whom Dean Johanna Bond reports directly in the University structure (i.e., Rutgers University President William Tate & Rutgers University-Newark Chancellor Tanya Smith-Jackson)."  (Emphasis in original).

220.    Rutgers University's Problem Solving Procedure also provides, relevant to Step 2, "Within one [sic] five (5) work days of receipt of the Step 2 request, *the Step 2 hearing officer shall arrange a meeting with the staff member and the Step 1 hearing officer for a hearing on the allegations*."  (Emphasis added).

221.    Again, violating their own putative due process safeguards in Rutgers University's Problem Solving Procedure at Step 2, as with Step 1, Ms. Dellatore sent correspondence on February 22, 2026 stating, without basis in policy, law, or contract, that "Because OEE's assessment may bear on issues raised in the Problem Solving process, the University will pause the Step 2 hearing pending completion of OEE's review. Once that process concludes, you will be notified regarding next steps in the Problem Solving matter."

### *Prejudged "Hearing" Before a Non-Impartial Step-2 Chancellor and Due Process Denial*

222.    Also violating their own putative due process safeguards in Rutgers University's Problem Solving Procedure at Step 2, on March 4, 2026, Dean Bond hosted a meeting with other

RLS and Rutgers University officials, including Chancellor Smith-Jackson.

223.    At this March 4, 2026 public hearing, Chancellor Smith-Jackson - who was slated to serve as a Step 2 hearing officer -  publicly expressed her unequivocal support for Dean Bond and her decision to terminate Dean Dawkins, stating, in relevant part, "*I've heard over the weeks, at least internally about the program and the decision that was made by our deans, and I back our deans . . . our Chief Executive officers of their schools. And they are held accountable, and ultimately, ultimately, I am held accountable for the success of the schools and the programs and initiatives that are run in those schools.*"

224.    During the March 4, 2026 public hearing, Chancellor Smith-Jackson made a shocking (***pre-step 2 Hearing and pre-EEO investigation***) public declaration on behalf of Rutgers University, fully supporting Dean Bond's decision to terminate Dean Dawkins.

225.    On March 4, 2026, the Chancellor stated, in part, that she "***backed it [the termination] fully***" and that it "***is a rational decision,***" adding the comparison: "***We as a university are just like a business***."

226.    At this March 4, 2026 public hearing, Chancellor Smith-Jackson publicly expressed her unequivocal support for Dean Bond and her decision to terminate Dean Dawkins, stating, in relevant part, "*And I've worked for private industry. I've worked for government, but people often question higher education, we've got to run our business. And that means there are instances where we have to make decisions.*"

227.    At this March 4, 2026 public hearing, Chancellor Smith-Jackson publicly expressed her unequivocal support for Dean Bond and her decision to terminate Dean Dawkins, stating, in relevant part, "*Again? They may not be popular decisions, but they are, I promise you, decisions based on rational inputs and rational assessments.*"

228.    Under Rutgers University's Problem Solving procedure, Chancellor Smith-Jackson was positioned to serve as Dean Dawkins' Step 2 Officer.

229.    Chancellor Smith-Jackson's public comments undermine Rutgers University's Problem Solving Procedure and evidence a bias in the process that rendered Dean Dawkins' continued participation moot.

230.    By pre-announcing that the University would stand by the termination before Plaintiff ever received a Step 2 hearing, the Chancellor irrevocably pre-judged Plaintiff's case, converted the promised Step 2 hearing into a sham, and deprived Plaintiff of the neutral decisionmaker and meaningful opportunity to be heard that Rutgers' own grievance procedures and basic due process require.

231.    On February 26, 2026, Dean Dawkins participated in an intake conference with Rutgers University Associate Director of Office of Employment Equity (EEO), Ms. Caitlyn Kelly.

232.    Following this meeting, Dean Dawkins submitted a formal complaint with the Rutgers University EEO. *See,* A true and accurate copy of the Dean Dawkins' February 27, 2026 Formal EEO Complaint (hereinafter, "EEO Complaint"), attached as **Exhibit I.**

233.    Dean Dawkins' EEO Complaint lays out several instances of Dean Bond and others undermining his professional growth, such as Dean Bond removing Dean Dawkins from teaching his popular, year-round Alternative Dispute Resolution course; Dean Bond forbidding Dean Dawkins from speaking in faculty meetings, instead only allowing the MSP Committee Chairs to speak at faculty meetings; Dean Bond ordering Dean Dawkins to cut off communications with MSP alumni by demanding the he dissolve the MSP Alumni Advisory Board; and Dean Bond arbitrarily declining Dean Dawkins' interdepartmental appointments,

40

while others were approved.

234. Dean Dawkins' EEO Complaint lays out several instances of Dean Bond and others targeting Dean Dawkins, such as Dean Bond stating to Mr. Salvati, according to his final investigative report that "Dean Johanna Bond (Bond), Rutgers School of Law, and King stated that they had raised concerns about Dawkins and questioned if he was coming in the office as much as he represented. ***Bond had been told by other co-workers that Dawkins was not in the office much and was operating his own law firm.***" (Emphasis added).

235. Dean Dawkins maintains that Rutgers University's post-hoc investigation of Dean Dawkins' many complaints over multiple years would have no material impact on the outcome of its Problem Solving Procedure, as Dean Dawkins was not the subject of the discrimination investigation and a finding one way or the other of discrimination *against* Dean Dawkins would not change his status with Rutgers University post-termination.

236. Dean Dawkins was terminated in such a rush that he was afforded no severance, no payout of his accrued sick days/vacation days, or any other such remuneration.

237. Dean Dawkins further asserts that Dean Bond's reasons for seeking to terminate him are pretextual and further emphasizes that he received no prior notice, warning, or progressive discipline.

238. Dean Dawkins further contends Dean Bond's decision to terminate him was motivated by discriminatory and retaliation animus for his advocacy and complaints to Vice Dean King.

239. Dean Dawkins asserts that the pre-Step 2 and pre-EEO investigation opinion issued by Chancellor Smith-Jackson on March 4, 2026, which "***fully backed***" and deemed Dean Bond's termination decision "***a rational decision,***" constitutes a denial of Due Process.

240.    Dean Bond's decision to terminate him was motivated by discriminatory and retaliation animus for his advocacy and complaints to Vice Dean King.

241.    Upon information, Dean Dawkins also contends that other similarly situated non-Black professionals and administrators at RLS who were found to have committed more serious infractions were either afforded progressive discipline or overlooked.

242.    Upon information, Dean Dawkins also contends that other similarly situated non-Black former RLS personnel, at least one of whom was specifically terminated for fraudulent activities, was afforded significant settlement agreements.

243.    Following Dean Bond's termination of Dean Dawkins, several on-campus protests have been led by RLS students and a number of public statements from student organizations and groups of concerned alumni have been issued, all demanding Dean Dawkins' reinstatement. *See,* A true and accurate copy of the Public Statements Made by RLS Students and Alums Demanding Dean Dawkins' Reinstatement, attached as **Exhibit J.**

## COUNT ONE

### (Title VII & NJLAD – Hostile Work Environment)

244.    Plaintiff incorporates by reference paragraphs 1 through 243 as though fully set forth at length herein.

245.    Defendants subjected Plaintiff to a hostile working environment and discrimination based on his race and age, as detailed above.

246.    For example, Defendants denied Plaintiff the same or similar due process rights to those afforded to his similarly situated colleagues.

247.    The hostile work environment was severe and pervasive based on the nature of the harassment, including egregious disparate treatment and failure to offer due process by

42

numerous Rutgers University, employees expressing animus towards Plaintiff, the constant and unwavering harassment and derogatory comments towards Plaintiff based on his race and age, and Defendants' blatant denial of Plaintiff's workplace rights because of his race and age.

248. Plaintiff considered the aforementioned conduct to be discriminatory, and reported said discriminatory conduct, both verbally and in writing, to numerous management level employees of Defendants, including, but not limited to Vice Dean King, Professor Auffant, and Rutgers University—Newark's Chancellor's Office.

249. Accordingly, Defendants were fully aware of the hostile work environment.

250. However, despite Plaintiff's numerous complaints of discrimination, Defendants failed to conduct an investigation or otherwise cause the discriminatory conduct to cease.

251. Rather than cause the discriminatory conduct to cease, Defendants retaliated against Plaintiff by threatening him openly and proceeding to target him for termination.

252. Defendants' stated reasons for Plaintiff's termination are pretextual, and he was actually being targeted through the actions of various Rutgers University departments being weaponized against him by Dean Bond in an effort to push Plaintiff out of RLS and Rutgers University for attempting to advance his workplace rights.

253. Defendants' acts and omissions were purposeful and designed to inflict discomfort on Plaintiff to effectuate a joint plan to push him out of his role with Rutgers University.

254. Accordingly, Defendants' discriminatory acts have deprived Plaintiff of equal employment opportunities because of his race and age in violation of Title VII and NJLAD, respectively.

255. As a direct result of the aforesaid unlawful discriminatory employment practices

engaged in by the Defendants in violation of Title VII, Plaintiff sustained permanent and irreparable harm, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

256.    As a further direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendants in violation of Title VII, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT TWO

### (Title VII & NJLAD – Retaliation)

257.    Plaintiff incorporates by reference all previous paragraphs as though fully set forth at length herein.

258.    The actions of Defendants, through their agents, servants, and employees, in subjecting Plaintiff to retaliation for opposing unlawful discrimination in the workplace, constituted a violation of Title VII.

259.    For example, Defendants denied Plaintiff the same or similar due process rights to those afforded to his similarly situated non-Black colleagues.

260.    Defendants also subjected Plaintiff to unlawful restrictions on his free speech and ultimately terminated Plaintiff's employment in retaliation for registering numerous complaints of discrimination in the workplace.

261.    The reason articulated by Rutgers University for Plaintiff's termination is pretextual, and Defendants' adverse employment actions were actually in retaliation for Plaintiff opposing unlawful fiscal practices and discrimination in the workplace.

262.    As a direct result of the aforesaid unlawful retaliatory practices engaged in by the Defendants in violation of Title VII and the NJLAD, Plaintiff sustained permanent and

irreparable harm, resulting in the loss of his employment, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

263. As a further direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendants in violation of Title VII and the NJLAD, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT THREE

### (NJLAD – Aider & Abettor Liability)

264. Plaintiff incorporates by reference to all previous paragraphs as though fully set forth at length herein.

265. The NJLAD § 10:5-12(e) sets forth in pertinent part as follows: "Unlawful employment practices, discrimination. It shall be an unlawful employment practice, or, as the case may be, unlawful discrimination: e) For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or attempt to do so."

266. Dean Bond, Vice Dean King, and Professor Auffant engaged in an unlawful discriminatory practice in violation of NJLAD § 10:5-12(e) by aiding, abetting, inciting, compelling, and coercing the discriminatory conduct against the Plaintiff as set forth herein.

267. Dean Regina, Dean Steinbaum, Dean Gomez, and Dean Saleh all engaged in an unlawful discriminatory practice in violation of NJLAD § 10:5-12(e) by aiding, abetting, inciting, compelling, and coercing the discriminatory conduct against the Plaintiff as set forth herein.

268. As a further direct result of the aforesaid unlawful employment practices engaged

in by the Defendants in violation of the NJLAD, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT FOUR

### (Tortious Interference with Contractual Relations)

269.    Plaintiff incorporates by reference paragraphs to all previous paragraphs as though fully set forth at length herein.

270.    For half-a-decade, Plaintiff served as the Assistant Dean & Director of the MSP and was allowed to serve as an adjunct teaching courses internal and external to RLS, and was offered an opportunity to teach with the HLLC, which teaching opportunity evidenced a prospective economic or contractual relationship and demonstrated that Dean Dawkins retained a reasonable expectation of economic advantage.

271.    Defendants' actions in spreading misinformation that influenced Dean Bond's decision to deny Plaintiff his role as an HLLC Instructor was an interference done intentionally, without justification or excuse, and with malice.

272.    Defendants' interference caused the loss of Plaintiff's prospective gain from his typical role as an HLLC Instructor.

273.    But for Defendants' interference, there was a reasonable probability that Plaintiff would have received the anticipated economic benefits by having his HLLC Instructor role with the Rutgers University renewed, as he had taught in the past.

274.    Defendants' actions interfering with Plaintiff's prospective contract caused Plaintiff injury and economic damage.

**COUNT FIVE**

**(False Light Defamation)**

275.    Plaintiff incorporates by reference to all previous paragraphs  as though fully set forth at length herein.

276.    Upon information and belief, Defendants have publicly and privately spread false and damaging information and published said information suggesting Plaintiff engaged in egregious conduct inappropriate so severe that his immediate termination was warranted in official faculty meetings, student and alumni town halls, and via email, which communications have operated to place Plaintiff in a false light, constituting unlawful defamatory statements.

277.    Upon information and belief, Defendants have further published false and damaging information accusing Plaintiff inappropriate interactions with students and/or accusing Dean Dawkins of engaging in an unspecified form of financial misconduct.

278.    Specifically, Defendants published their false statements of fact that Plaintiff had engaged in inappropriate interactions with and/or mistreatment of students and that Dean Dawkins had otherwise engaged in some form of financial misconduct, conduct purportedly so serious as to warrant his immediate removal.

279.    These statements are false in fact.

280.    Defendants knew their statements were false when made, as evidenced by: (a) the absence of any student complaint, disciplinary record, or finding of misconduct against Plaintiff during his nearly five years of service; (b) the unanimous public statements by student organizations demanding Plaintiff's reinstatement; (c) two student body resolutions calling for his reinstatement; and (d) the fact that Defendants' own investigative reports contain no finding of student mistreatment and/or financial malfeasance.

281. Defendants made or ratified these false statements of fact with actual knowledge of each statement's falsity or with reckless disregard for their truth or falsity, and caused the statements to be disseminated to Plaintiff's professional community, neighbors, current and former students, and colleagues.

282. To date, Defendants knowingly and recklessly continued to spread false information about Plaintiff, notwithstanding being put on notice of the falsity of the information.

283. The information spread by Defendants has been seen by third-parties that have broached the topic with Plaintiff in his daily life outside of his work with RLS and Rutgers University.

284. Neighbors in Plaintiff's town have approached him about the accusations against him concerning RLS and Rutgers University's allegations against him.

285. Third-parties, including Plaintiff's former students and work colleagues, have approached him stating they heard his employment was terminated because he had mistreated students.

286. Plaintiff has suffered damage to his reputation and has lost professional speaking and job opportunities as a result of Defendants' knowing and reckless spreading of misinformation about Plaintiff.

287. Plaintiff was embarrassed and offended by Defendants' spread of misinformation about him and his professional accomplishment as MSP Dean.

288. Plaintiff's legal counsel sent Rutgers University a cease and desist letter and litigation hold notice that went ignored by RLS personnel.

289. Defendants are well aware of the sensitivity of the information they spread and the damage to Plaintiff, and nonetheless have refused to refrain from spreading misinformation

48

about Plaintiff's interactions with his students.

290.    Plaintiff and his family have also suffered damage to their reputations in the community in which they reside due to the false information spread by Rutgers University.

291.    Defendants published false information about Plaintiff to their various internal and external email list-serves with a purpose contrary to the interests of any qualified privilege.

292.    Because of Defendants' unlawful actions, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT SIX

### (CEPA – Whistleblower Protection)

293.    Plaintiff incorporates by reference to all previous paragraphs as though fully set forth at length herein.

294.    Plaintiff reasonably believed that Dean Bond was committing an act of misappropriation by taking MSP's 2023 gala proceeds in violation of a law or rule or regulation issued under the law and proper accounting principles.

295.    Plaintiff reasonably believed that Dean Bond and Vice Dean King risked violating the law and creating an unlawful quota system by requesting Dean Dawkins recommend a specific number at which to cap admissions for the MSP, in violation of anti-discrimination laws or rules or regulations issued under the law.

296.    Plaintiff reasonably believed that Professor Auffant was advocating for illegal discrimination by criticizing Dean Dawkins for "watering down" the MSP and demanding Dean Dawkins align with Professor Auffant's stated belief that the MSP should reject White and/or affluent law student applicants into the program.

297.    Dean Bond, Vice Dean King, and Professor Auffant's actions are incompatible

with a clear mandate of public policy concerning workplace rights for employees based on protected status and/or protected activities.

298.    Defendants ultimately made a deal and set out to target and sabotage Dean Dawkins and the MSP to push him out of RLS and Rutgers University.

299.    There exists a clear causal connection between Dean Dawkins' protected activity and Defendant's retaliation insofar as Dean Bond terminated Dean Dawkins for his complaints to Vice Dean King, and was heavily influenced by other administrators in making her determination to terminate Dean Dawkins' employment with RLS.

300.    Because of Defendants' unlawful actions, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT SEVEN

### (Civil Conspiracy to Commit Wrongful Termination)

301.    Plaintiff incorporates by reference to all previous paragraphs as though fully set forth at length herein.

302.    Dean Bond, Vice Dean King, and Professor Auffant made an agreement and acted in concert to commit the unlawful act of attempting to interfere with Plaintiff and his department's performance in an attempt to mount justification to push him out of RLS and Rutgers University.

303.    Defendants specifically intended to work together to deprive Dean Dawkins of his property interest in his role with RLS.

304.    Dean Bond and Professor Auffant have made numerous public statements describing that the two had met in advance of Dean Bond's rushed termination of Dean Dawkins and that Professor Auffant made his involvement in their plan contingent on Dean Bond

promising not to diminish the MSP if he serves as the Interim MSP Dean while Dean Bond transitions Dean Dawkins out of RLS and Rutgers University.

305. Dean Bond confirmed in at least one public faculty meeting in February of 2026 that she had met with the Office of General Counsel to approve her broadcast messages defaming Dean Dawkins.

306. Mr. Salvati's UEC Investigative Reports show that Dean Dawkins complained during his several investigations that Dean Bond was weaponizing Rutgers University resources, personnel and departments to target and discriminate against Dean Dawkins.

307. Defendants employed unlawful means in their attempt fabricate a basis to justify terminating Plaintiff's role as Assistant Dean & Director of MSP.

308. Dean Bond, Vice Dean King, and Professor Auffant agreed to work together to find a justification for their desire to terminate Dean Dawkins' employment, resulting in the infliction of injury upon Plaintiff.

309. Dean Bond and Professor Auffant have admitted publicly that they met in advance of Dean Bond's final decision to terminate Dean Dawkins and exchanged terms of a deal to entice Professor Auffant to serve as Interim Dean of the MSP.

310. Dean Bond and Professor Auffant proceeded to make a number of broadcast communications announcing Dean Dawkins' immediate termination to faculty, staff, students, MSP alumni, and all of MSP's external employer partners, placing Dean Dawkins in a false light in his community of professional peers.

311. Dean Dawkins contends there is clear temporal proximity between his protected activity and the Defendants' taking of adverse actions against him.

312. Dean Dawkins contends that there exist inconsistencies or contradictions in the

Defendants' proffered reasons for their action, lending to an inference that Defendants' actions were informed and guided by unlawful discriminatory and/or retaliatory animus.

313. Defendants' overt accusations and spreading of false information about Plaintiff has resulted in damage to Plaintiff reputationally and economically.

314. Because of Defendants' unlawful actions, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT EIGHT

### (Section 1983 Claims—First & Fourteenth Amendment Violations)

315. Plaintiff incorporates by reference to all previous paragraphs as though fully set forth at length herein.

316. Plaintiff enjoys certain rights to free speech and due process under the New Jersey State Constitution and the Constitution of the United States of America.

317. Dean Dawkins, as an American citizen and resident of New Jersey, has the fundamental right to free speech and to speak freely at public meetings, including RLS faculty meetings.

318. Dean Dawkins, as an American citizen and resident of New Jersey, has the fundamental right to free speech and to speak freely with students and alumni of RLS.

319. Dean Dawkins, as a public employee at all times acting to protect the MSP and its positive impacts on the legal profession and not for personal gain, has a right to speak to issues of public concern, including but not limited to MSP budgetary issues, program status updates, program successes and outcomes, and program challenges or pain points.

320. Dean Dawkins was deprived of his free speech rights when, for example, Dean Bond forbade him from speaking at faculty meetings, required him to dissolve the MSP's

longstanding Alumni Advisory Committee, and based part of his termination on the notion that Dean Dawkins had allegedly provided unspecified putatively "confidential" budgetary information to students.

321.   Neither Dean Bond, RLS, nor Rutgers University had an adequate justification for treating Dean Dawkins differently from other members of the RLS and Rutgers University community as a result of any statements made by Dean Dawkins.

322.   Dean Dawkins, as an American citizen and resident of New Jersey, has the fundamental right due process when being deprived of a property or liberty interest.

323.   Dean Dawkins, as a state employee, has a protected property right and interest in his employment of which rights Defendants' actions and omissions deprived him.

324.   Dean Dawkins, as a state employee, has liberty right and interest in his professional reputation of which rights Defendants' actions and omissions deprived him.

325.   Dean Dawkins had an interest in continued employment that Defendants deprived him of when they acted to terminate his employment without investigation of his claims of misappropriation of MSP funds, discrimination, targeting, retaliation, and hostile work environment.

326.   Defendants did not have a reasonable justification nor sincere interest in investigation Dean Dawkins four (4) times, as Dean Dawkins had been twice cleared before Defendants' third investigation conveniently made a finding of an alleged policy defalcation from three (3) years prior to Dean Bond's decision to terminate Dean Dawkins.

327.   Dean Bond and Professor Auffant, by authoring and immediately broadcasting messages placing Dean Dawkins in a false light to his professional peers such as RLS faculty, administration, students, and staff; all MSP alumni; and all MSP employer partners, acted to

deprive Dean Dawkins of his liberty interest in his otherwise pristine reputation, creating a stigma to his reputation that has resulted in the loss of speaking engagements, paid teaching opportunities, awards, recognitions, and other profit producing endeavors.

328.    Dean Bond and Professor Auffant, by hosting town halls and faculty meetings and announcing publicly misinformation that objectively placed Dean Dawkins in a false light to his professional peers such as RLS faculty, administration, students, staff, and alumni, acted to deprive Dean Dawkins of his liberty interest in his otherwise pristine reputation, creating a stigma to his reputation that has resulted in the loss of speaking engagements, paid teaching opportunities, awards, recognitions, and other profit producing endeavors.

329.    Dean Dawkins was deprived of his due process rights when, for example, Ms. Dellatore failed to ensure Dean Dawkins was able to have his entitled representative available during Step 1 of Rutgers University's Problem Solving Procedure and when, after Dean Dawkins properly submitted the required materials to proceed to Step 2 of the Problem Solving Procedure, Ms. Dellatore acted unilaterally to "pause" the process, ignoring Dean Dawkins' objections and violating Rutgers University's own self-described "recourse to the 'due process' procedure".

330.    Rutgers University admits there is no basis in policy, law, or contract that gives them the power to unilaterally "pause" their own Problem Solving Procedure, even for purposes of awaiting the results of a post-hoc, post-termination EEO investigation of Dean Dawkins many complaints of targeting, discrimination, hostile work environment, and retaliation.

331.    Dean Bond is a state employee by virtue of her status as the Unitary Dean at RLS and, at all times here relevant, committed herself or caused other persons to commit actions or omissions that operated to deprive Dean Dawkins of his rights acting under color of state law.

332.    Defendants' overt accusations and spreading of false information about Plaintiff

has resulted in damage to Plaintiff reputationally and economically.

333.    Because of Defendants' unlawful actions, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT NINE

### (Intentional Infliction of Emotional Distress)

334.    Plaintiff incorporates by reference to all previous paragraphs as though fully set forth at length herein.

335.    By targeting, discriminating, retaliating, and ultimately terminating Dean Dawkins, and then acting to defame him in comparison to others terminated at or around the same time, Defendants acted intentionally or recklessly to harm Plaintiff.

336.    Given, for example, that Dean Dawkins was the only person subjected to four (4) invasive investigations for his outside work activities, notwithstanding that others like Vice Dean King were also listed publicly on their private law firm website as "Managing Partner"; that Dean Bond instructed that Dean Dawkins could not speak in public faculty meetings or communicate directly with MSP alums; that Dean Bond wrongfully accused Dean Dawkins of mistreating students, which is bellied by the many public statements and two (2) student body resolutions calling for his reinstatement; that Dean Bond cut all internal and otherwise arbitrarily declined to approved Dean Dawkins' teaching roles; that Dean Dawkins was consistently denied direct audience with Dean Bond; that neither Vice Dean King nor Dean Bond had Dean Dawkins' many complaints of financial misappropriation, targeting, and hostile work environment investigated; that Dean Dawkins was shocked and surprised with termination (in the midst of intermittent paternity leave and just a few days after Dean Bond had congratulated Dean Dawkins on the birth of his child in a Senior Leadership Team Meeting) and denied both Rutgers

University's own employee entitlements and policies concerning, for example, progressive discipline prior to termination and due process after termination, Plaintiff contends that Defendants' conduct was extreme and outrageous.

337. Dean Dawkins further contends that Defendants' actions and inactions were particularly egregious and the direct and/or proximate causes of his distress.

338. The emotional distress suffered by Plaintiff is so particularized, severe, and extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.

339. Since his termination, Dean Dawkins has been medically diagnosed with anxiety and depression and is seeking regular professional help to cope with traumas resulting from Defendants' objectively vindictive unlawful actions.

340. Defendants' overt accusations and spreading of false information about Plaintiff has resulted in damage to Plaintiff reputationally and economically.

341. Because of Defendants' unlawful actions, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## **PRAYER FOR RELIEF**

342. Plaintiff incorporates by reference Paragraphs 1 through 335 of his Complaint as though fully set forth at length herein.

**WHEREFORE**, Plaintiff requests that this Court enter judgment in his favor and against the Defendant, and order that:

a.   Defendants compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which he would have been entitled had he not been subjected to unlawful discrimination;

56

b.      Defendants immediately reinstate Plaintiff to his position or an equivalent position;

c.      Defendants compensate Plaintiff with an award of front pay, if appropriate;

d.      Defendants pay to Plaintiff punitive damages, compensatory damages for future pecuniary losses, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses as allowable;

e.      Defendants pay to Plaintiff, pre and post judgment interest, costs of suit and attorney and expert witness fees as allowed by law;

f.      The Court award such other relief as is deemed just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: March 6, 2026

LAW OFFICES OF ROOSEVELT JEAN, LLC

*Roosevelt Jean*

/s/ _____

Roosevelt Jean, Esq. (Bar #: 046202004)
LAW OFFICES OF ROOSEVELT JEAN, LLC
2 University Plaza, Suite 100,
Hackensack, NJ 07601
Phone: (201) 446-8486
Fax: 201-645-1201
Email: roosevelt@jeanjustice.com
Website: **www.jeanjustice.com**
*Counsel for Plaintiff,* Clifford Delroy Dawkins, Jr.

**VERIFICATION**

I, CLIFFORD DELROY DAWKINS, JR., of appropriate age and sound mind hereby verify that the statements contained in this Complaint are true and correct to the best of my knowledge, information, and belief.  I understand that false statements herein are made subject to the penalties relating to unsworn falsification to authorities.


Date _____3.5.2026_____        _ *[signature]* _____

                                        CLIFFORD D. DAWKINS, JR., *Plaintiff*